IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF MONTANA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF CELLULAR TELEPHONE:<br><br>DEVICE #2: LG Cellular phone, IMEI: 357021098754646,<br><br>CURRENTLY LOCATED AT 2970 KING AVENUE WEST, BILLINGS, MONTANA | Case No. MJ-19-6-BU-KLD |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Jeremy Crowther, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property; DEVICE #2: LG Cellular phone, IMEI: 357021098754646 which is currently in law enforcement possession and more

particularly described in Attachment A, and the extraction from that property of electronically stored information as described in Attachment B.

2. I am a Special Agent of the United States Drug Enforcement Administration (DEA) and an "investigative or law enforcement officer" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18.

3. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C). I, have been a Special Agent with the Drug Enforcement Administration since 2018. I am currently assigned to the Billings Resident Office (BRO) working with EMHIDTA. My current official duties as a Special Agent include, but are not limited to, the investigation of drug trafficking, money laundering, and complex conspiracies. I have conducted or participated in surveillance, the execution of search warrants, debriefings of witnesses, informants, and defendants, and reviews of taped conversations.

4. Through my training, education, and experience, I have become familiar with the manner in which drug traffickers and money launderers conduct their operations, including but not limited to, their methods of

importing and distributing controlled substances, use of telecommunication devices to include cellular telephones, computers and other such devices, use of counter surveillance techniques, and use of numerical codes and coded and/or cryptic language, words, and references to conduct their transactions. Also, I have testified in federal judicial proceedings. I have been involved in the debriefing of defendants, witnesses and informants, and others who know about the distribution and transportation of controlled substances, money laundering, and the concealment of proceeds derived from drug trafficking. Further, I have conducted or participated in physical surveillance, electronic surveillance, undercover transactions, and the execution of arrest and search warrants in numerous drug investigations. Prior to my current assignment with the DEA, I was employed by the Salt Lake City Police Department (SLCPD) in Salt Lake City, UT for eleven years. During my eleven years with the SLCPD I worked in different assignments including as a Detective, School Resource Officer, and Patrol Officer.

5. The information in this Affidavit is based upon my own personal knowledge, as well as information received from witnesses and other law enforcement sources. Because this Affidavit is made for the limited purpose of establishing probable cause to search the two (2) mobile devices listed below, I

have not recited each and every fact known to me as a result of the investigation described below.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

6. The property to be searched is a LG Cellular phone, IMEI: 357021098754646, hereinafter referred to as "Device #2". Device #2 is currently located at 2970 King Avenue West, Billings, Montana.

7. The applied-for warrant would authorize the forensic examination of the Device #2 for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

8. I am familiar with the ways in which drug traffickers conduct their business, including, but not limited to, their methods of transporting and distributing narcotics, their use of traditional mobile telephones, direct connect mobile telephones, and their use of numerical codes and code words to conduct transactions. I am also familiar with the ways in which drug traffickers and

4

people associated with drug traffickers use mobile telephones and the various functions and applications of mobile telephones such as sending, receiving and storing emails; sending, receiving and storing text messages, which is commonly referred to as short message system (SMS), to communicate with each other concerning their criminal activity and events surrounding their criminal activity. I also know that drug traffickers use their mobile telephones to store information and data such as names, addresses and telephone numbers of co-conspirators; calendar information including dates, entries and notations of events and circumstances concerning their criminal activity; and audio and video files of events associated with their criminal activity.

9. I know, based upon my training and experience, that drug trafficking and money laundering organizations routinely utilize several operational techniques. These practices are designed and implemented to achieve two paramount goals: first, the successful facilitation of the organization's illegal activities which consists of the distribution of controlled substances and the subsequent repatriation of the proceeds of that illegal activity; and secondly, minimizing the exposure of organizational members, particularly those operating in management roles, from investigation and prosecution by law enforcement.

10. As a result of my training and experience, I am familiar with how various drugs are used and the typical distribution and trafficking methods used by drug dealers and traffickers. In addition, I am also familiar with the typical methods used by traffickers to "courier" and clandestinely transport controlled substances. Based on my experience, I know that drug dealers frequently use mobile telephones and the functions and applications of mobile telephones to contact each other and/or their co-conspirators to arrange for the distribution of narcotics and collection of the proceeds from the sale of narcotics.

11. The Drug Enforcement Administration (DEA) and Russell Country Drug Task Force (RCDTF) HIDTA are conducting a criminal investigation into Ebony TAFOYA (herein referred to as TAFOYA) and her involvement in the James MCPHAIL Drug Trafficking Organization regarding possible violations of 21 U.S.C. §§ 841(a)(1) and 846.

12. James MCPHAIL is a known drug dealer in the Great Falls, MT area. MCPHAIL is currently incarnated in the Montana State Prison (MSP) in Deer Lodge, MT. MCPHAIL has an extensive criminal history including possession of dangerous drugs, and distribution of dangerous drugs.

13. On July 10, 2019, at approximately 5:30 p.m., Drug Enforcement Administration (DEA), Special Agent (SA) Jeremy Crowther, and Montana

Department Of Corrections (DOC) Investigator Robert Leonard, debriefed a Confidential Source (CS) about the drug trafficking activities of Ebony TAFOYA and James MCPHAIL. According to the CS, MCPHAIL utilizes associates and friends outside the correctional center to obtain and sell drugs both inside the correctional center, and outside of it. The CS stated that MCPHAIL utilizes Ebony TAFOYA to bring methamphetamine and marijuana from California, to different areas of Montana. The CS also mentioned that MCPHAIL utilizes other people to bring large loads of marijuana to sell in Montana.

14. The first time the CS met TAFOYA, TAFOYA brought a pound of OG Kush marijuana, and the CS purchased one pound of OG Kush for $2,000.00. The CS purchased two more pounds of marijuana from TAFOYA. The CS purchased marijuana one time in the parking lot of the Holiday Inn in Great Falls, MT. The other time the marijuana was purchased at the Rocker Inn outside of Rocker, MT.

15. TAFOYA brought the CS a pound of methamphetamine three times over a 6 months period, beginning February 2018 to June 2018. The methamphetamine was always vacuum sealed, and had no identifiable markings. The methamphetamine was always very high quality according to the CS. The CS stated that the last time TAFOYA brought methamphetamine the

CS did not pay TAFOYA back. The CS currently owes $3,000.00 to MCHPAIL and TAFOYA. The CS explained that he/she attempted to pay TAFOYA back but she stopped communicating with him/her.

16. On November 15, 2018, Ebony TAFOYA was stopped by Montana Highway Patrol (MHP) Trooper Kilpela on interstate 90 in Stillwater County. TAFOYA was a passenger in the vehicle. Trooper Kilpela developed probable cause the vehicle was transporting illegal drugs. Trooper Kilpela deployed his K9 Mika who alerted near the driver's side sliding door of the vehicle. A Montana State Search Warrant was obtained, during the execution of the search warrant approximately 1 pound of methamphetamine, and a small amount of marijuana was located. The CS explained to investigators that TAFOYA was bringing methamphetamine and marijuana under the direction of James MCPHAIL.

17. On August 14, 2019, Ebony TAFOYA contacted the CS several times and asked the CS if the CS, "wanted to babysit 8 kids". According to the CS this is code talk between the CS and TAFOYA. "8 kids" means that TAFOYA was offering the CS 8 ounces of methamphetamine.

18. On August 16, 2019, Ebony TAFOYA contacted the CS and advised the CS, that TAFOYA would be driving down to see the CS. On August 16, 2019, the CS, DEA SA Jeremy Crowther, and RCDTF HIDTA

8

coordinated a plan to purchase 8 ounces of methamphetamine from Ebony TAFOYA. On August 16, 2019, the CS met Ebony TAFOYA outside a bar in Great Falls, MT. TAFOYA provided the CS with approximately 8.5 ounces of suspected methamphetamine. After the deal, the CS met with Great Falls HIDTA and turned approximately 240 grams of a white crystal like substance to RCDTF HIDTA. RCDTF HIDTA sent the suspected methamphetamine to SA Jeremy Crowther, who sent the substance to a DEA drug lab for testing.

19. Ebony TAFOYA was in contact with the CS on August 22, 2019. They briefly discussed in code that the CS owes TAFOYA $700.00 per ounce for a total of $5,600.00 dollars for the approximately 8.5 ounces of methamphetamine that TAFOYA gave the CS on August 16, 2019. They discussed setting up another deal the next week for more meth.

20. On August 27, 2019, Ebony TAFOYA met with the CS in Great Falls, MT. The CS had contacted TAFOYA earlier in the day and they arranged to meet in the evening of August 27, 2019. The CS met TAFOYA, and TAFOYA gave the CS approximately 4 ounces of methamphetamine. During this meeting they discussed setting up another meeting in about a week for a pound of meth.

21. SA Crowther obtained a search warrant for GPS location on TAFOYA's cell phone. TAFOYA had traveled from California to Las Vegas,

NV, to Midvale Utah. On September 06, 2019, Salt Lake City DO, TFO Brummer observed Ebony TAFOYA at 669 3rd St, Midvale UT. TFO Brummer observed a rental vehicle bearing AZ license plate CEJ2953 leave the residence. TFO Brummer observed someone who appeared to be Ebony TAFOYA driving the vehicle. The cell phone was turned off and SA Crowther was not able to monitor TAFOYA's movement.

22. SA Crowther called Idaho Falls and listed the AZ plate CEJ2953 into their license plate reader. On September 06, 2019, the vehicle was observed driving Northbound on I-15 by the Idaho Falls license plate reader. SA Crowther coordinated with Montana Highway Patrol (MHP) to conduct a traffic stop once the vehicle came into Montana. On September 06, 2019, Montana Highway Patrol conducted a traffic stop on Ebony TAFOYA. TAFOYA was taken into custody and found to be in possession of approximately 922.8 grams of methamphetamine. TAFOYA had hidden the methamphetamine on her body. Approximately 518 grams of methamphetamine was located around her stomach using a belly band. After being taken to the Butte Silver Bow detention facility Corrections Officer House located approximately 404.8 grams of methamphetamine in TAFOYA's bra and chest area.

23. Ebony TAFOYA had Device 2 with her in the vehicle when she was stopped by Montana Highway Patrol.

24. Investigators know that drug traffickers frequently use mobile devices such as cellular phones to coordinate their activities. Investigators believe that a search of Device #2 will provide further evidence of violations of federal statutes.

## TECHNICAL TERMS

25. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-

11

mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

26. Based on my training, experience, and research, I know that these Devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

27. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some

period of time on the device. This information can sometimes be recovered with forensics tools.

28. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper

context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

29. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device

to human inspection in order to determine whether it is evidence as described by the warrant.

30. *Manner of execution.* Because this warrant seeks only permission to examine Device #2, which is already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

31. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of Device #2 described in Attachment A to search for the items described in Attachment B.

Respectfully submitted,

/s/ Jeremy Crowther
Jeremy Crowther
Special Agent
Drug Enforcement Administration

Subscribed and sworn before me on the 16th day of September, 2019.

15

*[Signature]*

United States Magistrate Judge